And we will go on to case number two, which is appeal number 14-25-23, Williams v. Indiana State Police. Morning, Mr. Southerland. Good morning, Judge. If it pleases the court, my name is Michael Southerland, I'm representing the estate of Billy Williams. 911 is a universal call for assistance and help. Billy Williams, the father of Tyler and Jacob, was threatening suicide on January 15, 2012. He was killed by various police officers, including two conservation officers, who chose to ambush him with tasers and guns instead of talking to Billy Williams while he was in his own bathroom in his own home. The police officers from the different agencies did not assist. They shot him after arriving 29 minutes. They didn't talk to him. They didn't say a single word to him. The family expected medical assistance. Billy's mother, Patty Setti, had called for medical assistance. The son, Jacob, called 911. None of them thought the response would be so terrible and that the response would be using violence. In fact, when Tyler, who was allowed to stay in the room, observed the officers drawing out their weapons and training them on the door, he cautioned them, put those away, you don't need those. But instead, their plan, such as it was, was to pop open the door. Surely you are not arguing that a family member can tell the police to put their weapons away or do anything else under circumstances like this. Well, under the circumstances, I think that the police have a duty to integrate all the information they have, including information from family members. And to be reasonable in their evaluation, the case law cautions officers that they are to treat distraught and suicidal and emotionally distraught people differently. In this case, you have somebody who's under the influence of drugs and alcohol. Well, help me with this. Sure. The family members broke down the bedroom door to get to Billy. But they did not unlock the bathroom door to get to him. Once he threatened them, even though they knew he was in the process of trying to kill himself. Wouldn't that indicate that they thought entering the bathroom would cause him to hurt himself or others? I mean, what other reason would there be for their failure to enter the bathroom, given that they knew how to unlock the door from the outside? Well, common sense, I think, Judge, would dictate that if somebody is suicidal and distraught and irrational, under the influence of drugs and alcohol, and their one demand, their one constant demand is don't come in here, then you talk to them through the door. That's the way the national standard is. When you have somebody who shows up- Well, you talk to them through the door unless you think they're bleeding to death. But there was no evidence that he was near death. Well, they saw blood splattered on the wall. That's in dispute, Judge. That's in dispute. That's a fact question. Wasn't it undisputed that he had cut himself in an effort to commit suicide and was bleeding? It's undisputed, but there's a question. We have Dr. Core, who said it is unlikely, highly unlikely, that anybody who cuts their wrist would be bleeding out and dying. And so let's just say, as you alleged, that the police officers have a duty, or at least have the right, to intervene should they believe this is exigent circumstances. I think that's what the court's asking. And we believe that the evidence suggests that it's just the opposite. When Tyler was used as the go-between and asked questions prompted by the police, they said, don't tell him we're out here. Don't let him know we're here. He doesn't know we're here. Every question that Tyler asked, Dad, what are you using? Don't do that. How are you? He had a turkey baster in there. He had told him he had taken alcohol. They were responding. A person using common sense, even a parent dealing with somebody who's locked in the bathroom. If they make that demand, don't come in here, then you would have to think, well, all right, I'll continue to talk. That's what a suicidal person is going to do. They're going to make demands. If the demand is reasonable, in other words, I'm not harming anybody. I'm talking to you. I'm responding. I'm standing up. Tyler said that he became more calm as time went on. But he was threatening to kill anyone who tried to enter. But he didn't, Your Honor. How do we know that those were idle threats? The court should take a look at all the cases we've cited. A conditional threat is really not a threat. Buster, if you come in my house, I'm going to knock your block off. He doesn't come in the house, it's not a threat. In this case, remember, the police stood outside there and did nothing. They did absolutely nothing. If you called the police or you called a medical person and you had a suicidal person, what would you expect, judge? Wouldn't you expect them to engage that person, to talk to them, to see what the real issues are, to see, can they offer, say, information? Can they give you water? Can they give you food? You would engage them to gain their confidence, to calm them down, to see what the real issues are. We stated in our brief and in our experts that it takes on average four and a half hours for a person to deal with a suicidal individual who's intent on killing themselves, to bring them down, to bring them into a rational state. Well, we have to, you know, what we're faced with is what the officers were faced with. In other words, we have to decide whether the officers were faced with exigent circumstances. I agree. So, combined with the evidence that he had taken all these annex he had and had cut himself in an effort to commit suicide and was bleeding, aren't those exigent circumstances for the police? Those are facts, but they don't lead to an exigent circumstance conclusion. So how bad would the bleeding have to be? The bleeding would have to be such that you could see that he was losing consciousness or becoming incoherent. So, a couple minutes ago you said that it was disputed, the amount that he was bleeding. Is there something other than the expert opinion that you're behind? The expert opinion was one of the things that the judge excluded. After the fact. And in fact, that- But was there any contemporaneous evidence about, that would bear on whether the degree of bleeding or how much he was bleeding or whether he was bleeding out or whatever, that that was a genuinely disputed fact? Sure. What is it? He says, it's not going the way I planned. The information I got off the internet isn't working. And by the way, it's going so badly I want you to go get a gun. So if you were to hear that, you'd say, I guess he's not bleeding out. He wants to rush this thing along. And in fact, it's such an extraordinary, outrageous action by the part of police to say, okay, let's go through this charade. Let's put the gun on the floor and see if he pops open the door. Now imagine, with all the case law we've cited, that says you cannot use any substantial force against a person who is not resisting. And not even, or if he is passively resisting, you can't do that. They pop open the door, he's standing there with no weapons, totally surprised, and they shoot him with tasers. And most important, judge, they never give a single command. They never say a single word to him. They never ask him to do anything. The only word that is heard after the door pops open is run. Is what? Run. Run, yeah. All right, so you have all this information. And more importantly, if you look at their timeline, Jacob shows up first, knocks the door down, talks to his father. And then he goes out to see if he can catch the other police officer. In the meantime, Hallam shows up. But they ask all the family to go out, six family members. They ask them to all go out, but they don't gather any additional information. Instead, all the officers, this is important, if you're worried about imminent harm, all the officers go outside to figure out if they can look in the window. Now, you know the district court held that the plaintiffs here had failed to point to any evidence that contradicted Hallam's testimony that a conversation occurred, and which was also corroborated by the three officers who stated that Hallam told them he spoke with Williams. You're saying that there wasn't a word spoken, correct? I'm saying two things. One is that we're disputing that Hallam even talked to them because Chad, who assumed command, said to Tyler, don't make any noise or tell them we're here. He doesn't know we're here. That seems totally inconsistent with somebody who just acknowledged or had previously told him he's a police officer standing outside the door. That fact is so inconsistent. The second thing is, if a police officer had identified himself, and why would the father say, go get a gun? It's not going well. That doesn't make any sense. And the third thing, and most important thing, is that that fact was never shared with any family member. Nor was it overheard by any family member. And when Tyler was present in the bedroom for the entire time, he disputed that Hallam had the chance to say that because of the instructions he was given by Chad not to let anybody know we were here. And most importantly, when they were trying to decide what to do, they never included the son in this discussion. He never was told the reason we're going in here is because we believe there's some sort of exigent circumstances. They just ran out of what to do. There was no exigent circumstances included in their discussion, and Tyler overheard every word that was being said. Did they have any kind of a, hostage negotiator is the wrong word, but did they have any kind of trained person there on the scene anywhere that deals with- There was no trained person that had specific training in negotiating with a suicidal person. But they did have medical people, and they could have said to the medic, he said he's cut himself, what would be the signs if a person starts to bleed out? What should we look for? And they would have said, I am absolutely certain, he would start to be slurring his words, he would start to stutter, he might even fall to the ground. And there was no evidence, in fact, just the opposite. When they were talking to him, he was being a little bit agitated that they couldn't get the gun out of the door, there was evidence that he either got down on his hands and knees to look, and then stood up. So when they, let's just say you had goggles on and you couldn't see anything. When they opened the door, what is the emergency? Well, he's standing there with a knife in front of him. Let me ask a question about- He's not standing, he's standing facing them, the knives are behind him. Do we know why the taser didn't work? Did the probes not hit him, or is there any evidence about that? One of the probes probably hit him, the other one didn't. This is 50,000 volts. We deposed each officer, and each officer said they knew from their own training that when a person is under the influence of alcohol and drugs or is very distraught, that they don't often work. A lot of times they don't often. In fact, they knew it didn't work all the time. That's why the backup plan was to draw the guns and point them at the door, and if something goes wrong, we're going to shoot him. That was their plan. And that is a plan which should not ever be allowed to exist in this state or in this country. That is no plan at all. When you call for help, you should not expect the police to draw out their guns instead of using common sense and try to talk somebody down who was intending to commit suicide. And we're not even sure how serious he was, because he didn't write a note. He called his two boys, which is a signal, typically, that they want help. He didn't send the boys away. I remind you, he did not send anybody away. He just didn't want them to come in the bathroom. So when they shot him with the taser, is that a Fourth Amendment seizure? That's the Fourth and Fourteenth Amendment violation. That's a use of force without justification. And the reason that you say there was no justification is that he didn't have a weapon in his hand. There was no imminent threat, because it was sort of on the if-come conditional, whatever it was you used. And so they shouldn't have shot him with the taser. They shouldn't have shot him with the taser. No, I mean, if what had happened is that if they had opened the door and he was coming at him with a knife, no question they could have shot him, right? I'm not even going to address that question, because if he started coming out, let's just say you had a good plan, and I've done a lot of these police cases, the good plan is you have some distance. So if he comes out, you can do a lot of things. You can put a chair in front of you. A knife is not as threatening as it appears to be. I've dealt with somebody who comes at me with a knife. Guess what? You walk away. You don't shoot him. There's no reason to shoot a person. There was no hostage there. So I'm not going to answer that question emphatically, because I don't know. The police officer, though, could make the argument, I was in fear of my life. But as we've cited in our case law- But your theory, basically, if I'm getting it right, is that the bad seizure was the shooting with the taser, and then everything else is just a matter of proximate cause, basically. Yes. The cases we've cited, the SLED case, the Brown case, if a police officer breaks the law, in this case we think he broke the law by using excessive force and firing the tasers without justification, then everything that happens after that, that is foreseeable, and is the proximate cause of that he is liable for. And all the officers are liable because they all participated in the plan. You're deep into your rebuttal. Can I save the rest of my time, Your Honor, for that rebuttal? Whatever it is. Whatever it is. There's not going to be a whole lot of time for rebuttal. I'm sorry. I wanted to ask questions. Sure. Mr. Stevenson. May it please the court. James Stevenson. I'm here on behalf of defendants Putnam County Sheriff and John Chadd. I'd like to open my remarks by reminding the court of what evidence is undisputed in the record, and that the district court noted that the officers relied upon in order to deploy force. First and foremost, Williams was suicidal. He had taken substantial steps toward committing suicide. He had cut his wrists. He had consumed Xanax. According to the son, a half a bottle of it. He had repeatedly threatened to kill or stab anyone who opened the bathroom door. He made those threats to family members, to Officer Hallam, and to anyone else. He had cut himself, so it was reported to dispatch. After the door was opened, there were two large knives on the sink right at his fingertips. So shooting him with a taser was a Fourth Amendment seizure, right? Yes, it was. OK, so what justified that? Was it the threat, or was it the fact that he was suicidal, or both, or what? The fact that he was threatening repeatedly to stab or kill anyone who opened the door. If they opened the door, he would stab. Or he would do something to him if they opened the door. Well, it was not. Is that immediate enough to actually be a crime under the statute that the judge cited? It can constitute intimidation, defelony intimidation, that the judge cited. But we weren't going in for purposes of arresting him, Your Honor. Well, but you had to have a reason to taser him. And as I was asking what the reason was, and you said it was because he had committed this crime. Is that not the right answer? No, I did not say he committed a crime. The court asked, is there a crime involved? There is defelony. OK, well, let me ask the question again. What was the justification for tasering him? The justification was to employ a non-lethal force against an individual who was a threat to the officers. But is it reasonable to immediately resort to non-lethal force without providing an opportunity for a captive person to comply? In those circumstances, this was a bedroom. The officers were only a few feet from the door. They were not under a constitutional obligation to carry out a seizure that would have allowed Williams to carry out his threats. They had to deploy something to subdue him, so to speak, to get him to the ambulance. Let me go back to my question, because I really kind of thought you were dancing around a little bit. So the justification for using the taser was what? The justification was the door open. There's knives on the sink at his fingertips. He had threatened to kill anyone who opened the door. The tasers were deployed with the expectation that he would. OK, so it was the fact that he was there in the room. He had these knives that were within reach, and that he had made a threat to kill anybody who would come in. Correct. So why not just stay outside? Then the threat doesn't, then there's no threat. Threat's only if you come in. Well, they tried to get him medical assistance because they thought he was. They didn't even let him know they were there. I mean, that was kind of the whole point. That's not true.  The second guy said he doesn't know we're here, right? The officer. The commander. Officer Chad told the boy, don't let him know we're here, because they perceived that Williams was becoming more agitated. They didn't want him to know that there were multiple officers there. Officer Chad thought the boy could communicate with his dad and maybe get him to come out. So what was the plan? The plan was we'd taser him to subdue him, and then we can get a medical attention. Well, once they saw the blood through the window, time was of the essence, or so they determined. So they had to try to get him out in a safe means. This was the safe means. Taser him and get him medical attention. Yes. There was an ambulance there. I might also add, because the court inquired, was there a specialist there? Officer Chad did call for the negotiator. I'm not sure that really matters. I was just curious. So do you know why the tasers didn't work? What's the evidence as to why the taser didn't work? Because it sounds like what happened is they tasered him, and he just kept walking. Well, they tasered him. He picked up the knives, and then he tried to kill Officer Hallam. So do we know why the taser didn't work? Tasers, I guess. We don't know for sure, but we do know there were two marks on the body where there were taser barbs. Yeah. And so Were there two different tasers that were shot at him? There were two tasers. And each one has two barbs, right? Right. So do we know whether it was one from each, or two from the same one? No, we don't, but the speculation is that one barb came from each, hence they weren't effective. Is it your position that there's no clearly established law requiring officers to allow a person to voluntarily comply before resorting to non-lethal force? There is no case on analogous facts which put these officers on notice that where you have a suicidal individual who had made threats to kill and stab anyone who opened the door, that deploying a taser for purposes of simply subduing him to get him medical attention violates the Fourth Amendment. It's their burden to make that showing. They made no such showing, not in the district court nor at this level. I'd also like to point out that the plaintiff's theory is essentially one of a deficient plan. They really don't even contest the use of deadly force in the brief. They don't make that claim. They're trying to make a claim based on pre-seizure conduct, which has been rejected by this court. Well, but part of the claim is that they shouldn't have tasered him, and that's a seizure, and that what happened after that is part of what's proximate cause. So they're not just relying on pre-seizure conduct, whatever that means. You're relying on pre-seizure conduct, I might add. Everyone relies upon pre-seizure conduct. I know, but you just criticized him for doing it. I mean, in terms of determining under the totality of circumstances should force be used and at what level. That's true. But what they're arguing and what the district court rejected was the notion that the fact that they didn't go and undergo greater planning or take other measures constitutes a deficient method or plan of going about trying to rescue this man. That doesn't violate the Fourth Amendment. We have to look at the seizure itself, the deployment of deadly force or the taser, and ask, was it permissible and constitutionally reasonable, and or whether their qualified immunity applies in each instance. Should tasers even be considered non-lethal force, given that their use has resulted in death at times? Particularly here, where you've got the simultaneous deployment of two tasers, and it was all planned. It is considered mid-level non-lethal force. The notion that the court will look at Abbott versus Sangamon, it talks about this 50,000 volts. In fact, upon contact, it's a mere 1,200 volts upon contact. It's the safest means available under these circumstances to deal with this type of individual. Going in hands-on was not an option. Going in with OC spray was not an option. These were options considered, by the way. Officer Chad did think about, can I call out a SWAT team? Maybe they'll have a shield. But it wasn't feasible. This is in a rural area. They acted because they thought time was of the essence to try to help Williams. And it was Williams who then attacked officers, which resulted in the deployment of deadly force. The appellants appear to be relying upon cases like SLED versus Lindsay, which is a knock-and-announce case. It's distinguishable from this circumstance because we have a circumstance like in SLED where there's a Fourth Amendment violation due to no knock-and-announce. And any liability or any advert consequence that flows thereafter can be attributed to that violation. Here, this is not a search case to begin with. We're not dealing with a warrant or knock-and-announce. They were there because they called officers. For qualified immunity purposes, your honors, Mr. Williams was not passively resisting or non-resisting, as that term has been applied to other Section 1983 plaintiffs, such that it could be claimed that use of the tasers in this instance violates the Fourth Amendment. We need to ask ourselves, does a reasonable officer confronted with this situation, suicidal individual, bleeding, knives, threatening to kill anyone, does the deployment of a taser simply to take him down to get him to an ambulance violate the Fourth Amendment? If not, the officer is entitled to qualified immunity. I'd like to distinguish our facts, for example, from a true instance of a non-resisting subject, such as in the case of Phillips versus community insurance. This was the use of the rubber batons. The individual was in a car. She was seated in the car. Her feet were on the pavement. She was non-resisting. This guy was actively resisting. He threatened to kill anyone. I guess I have to come back at you on that. What was the active about the resisting? Before they opened the door, was he actively resisting? He was threatening to kill anyone who opened the door. So active resisting can include words about something that you might do in the future. That constitutes active resistance? It's a threat, yes, Your Honor. So if somebody is inside a door and says, if you come through the door, I'm going to hurt you, that would be justification for, like, let's go through the door right now? That by itself? I'm not saying it's justification or not. Well, I'm asking you, though. Is it? Would it be? It is a threat such that he cannot be viewed as passively resisting such that no force should be employed. So active resisting can be words alone, is what you're saying. Well, these type of words, yes. I mean, at least to justify non-lethal force. You don't have a problem, I would think, if they opened the door and went in hands-on, no lethal force. They had to do something. They had to either go hands-on or use something. I guess I'm just concerned about the saying that this was active resistance. I mean, I think Mr. Sutherland gave the example. He said, like, if you come into my backyard, I'm going to slug you. Is that active? Well, he's referring to the Toland case from the Supreme Court, where there was some ambiguity in the remark. Here, there's no ambiguity. No reasonable officer would view that remark. I'm going to kill you if you come in the door as anything other than a threat. I see my time has elapsed. Thank you, Your Honor. Thank you. Ms. Garn. Good morning, Your Honors. Good morning. May it please the Court. I represent the state officers, Trooper Thomas of the Indiana State Police, and conservation officers Labhart and Springston of the Indiana Department of Natural Resources. The arguments presented in the appellee's collective brief  in the State Department of Natural Resources are the following. to the state officers, but I just wanted to be available for questions pertaining particularly to the state officers and to the extent necessary to make a few points particular to them. The events of the night of January 15, 2012 unfortunately ended tragically. Officers Labhart and Thomas were required to shoot Mr. Williams when Officer Chadds and Hallam's tasers failed to stop Mr. Williams from advancing toward Officer Hallam, apparently preparing to kill him. As was confirmed today, the estate's legal theory, the Williams estate's legal theory, has never been that the use of lethal force was excessive. And to the extent that the Williams estate suggests that it was, attempts to make that argument in its reply brief at page 12, note one, that argument is not properly before the court. And then secondly, as your honor had observed, I just wanted to underscore that the evidence-based argument that pertains to the state officers, whether they were able to see through the bathroom window and what they were able to see through the bathroom window ultimately is immaterial because the officers had that information from other sources. What information? The information that Mr. Williams was suicidal and that he had cut himself. I thought what they claimed to have seen through the window was blood all over the place, quote unquote. Did they have that information from other sources? They did not have that. OK. So the thing about him being suicidal, that's not even disputed. I think the thing that was critical was how much blood there was. That's disputed, right? Right. But they knew from the 911 dispatcher that he had cut himself. And so that, in combination with the information that they gleaned by looking through the window. But was there a dispute about what they, there was a dispute about whether they were able to see through the window, right? Right. The estate disputes that, but they didn't present any affirmative evidence disputing the account of the state officers. And in fact, it's not enough that somebody who lives in the house saying that you can't see through that window from a ladder. I mean, I would think that if it was my house and somebody says they were able to see through a window with a ladder and I say, no, you can't do that. That's too high up. There's no, they don't make, that kind of ladder that they were using doesn't go up that high. I mean, why wouldn't I know that? It seems to me that that was disputed. I don't know. Right. I mean, to the extent that that, I think right now, though, that point isn't really one that is made before this court. I think that the information that was presented from the son, Tyler, was perhaps told to him by other officials, by other individuals and that that wasn't his impression. OK. The state officer's request that this court from the entry of summary judgment in their favor. Thank you. Thank you. Really great question. OK. With regard to qualified immunity, the Abbott case, which we cite, denies any qualified immunity. The law was clearly established since 1995 that police cannot use tasers against somebody who is not actively resisting. Second of all, I want to emphasize there was not a single word mentioned to Mr. Billy Williams. Had they opened the door and said, Billy, I want you to come out with your hands up, fall on the ground, do anything, then they might have a different argument. But to shoot somebody by surprise is. Again, I have to say that the judge found that there was a conversation. Well, the judge drew the inferences. She's not allowed to draw, Judge. The inferences are supposed to be drawn, as were instructed by the Tolan versus Cotton case from the Supreme Court. The trial judges and the lower judges are not supposed to draw inferences favorable to the police. They're supposed to draw inferences that are favorable to the non-moving party. In that case, it is the estate of Billy Williams. And the inference to be drawn is that he was surprised at the door being opened. He was not given any instructions. And he was tased without warning. And he was suicidal, delusional, and under the influence of alcohol and drugs. I would think under that circumstance, you could fairly and reasonably foresee that this was a disaster about to unfold. In fact, the officers who drew their weapons and pointed at the door knew that was likely to happen. Thank you. We believe that the court reviews the noble. Unless you have another question, I'm sorry. Thank you very much. Thank you very much. The case will be taken under advisement.